# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Sampson and    :
Linda Sampson a/k/a    :
Lida Sampson, jointly    :
and individually,      :
     Appellants  :
           :
   v.       : No. 355 C.D. 2016
         : Submitted: September 30, 2016
The Tax Claim Bureau of   :
Chester County and CJD Group, LLC :

BEFORE: HONORABLE MARY HANNAH LEAVITT, President Judge
     HONORABLE MICHAEL H. WOJCIK, Judge
     HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION
BY PRESIDENT JUDGE LEAVITT    FILED: December 12, 2016

David and Linda Sampson (Taxpayers) appeal an order of the Court of Common Pleas of Chester County (trial court) that denied their petition to set aside the December 9, 2013, upset tax sale of their property to CJD Group, LLC. Taxpayers assert that the upset sale was invalid because it did not conform to the requirements of the Real Estate Tax Sale Law (Tax Sale Law).[1] Specifically, they assert that the Chester County Tax Claim Bureau (Tax Claim Bureau) did not offer an installment agreement that complied with Section 603 of the Tax Sale Law, 72 P.S. §5860.603, when they tendered payment of more than 25% of their outstanding real property taxes. We reverse.

Taxpayers own property located at 190 Sawmill Road in Landenberg, Pennsylvania. When Taxpayers did not pay the 2011 real estate taxes owing on the Property, the Tax Claim Bureau listed the property for upset sale on September 9,

---

[1] Act of July 7, 1947, P.L. 1368, *as amended*, 72 P.S. §§5860.101 - 5860.803.

2013.  The scheduled sale did not go forward because on September 6, 2013, Linda Sampson executed an agreement entitled "Continued Installment Agreement" (2013 Agreement) with the Tax Claim Bureau, which stated as follows:

> [O]wner agrees to pay the balance due of all liened taxes in installments as follows:
>
> - The sum of $4,500 at the time the agreement is executed
>
> - Balance of 2011's by December 6, 2013
>
> - The remaining balance of all real estate taxes owed by June 30, 2014
>
> ***
>
> The Tax Claim Bureau … in consideration of said payments and the within Agreement by the said owner to pay the balance due of said taxes in installments as aforesaid as well as pay both current and future taxes due to all taxing authorities, agrees that sale of said parcels for delinquent taxes shall be initially continued to December 9, 2013 and subsequently stayed for 2013 so long as the said Agreement on the part of the said owner herein made is being fully complied with.

Reproduced Record at 160a (R.R. __).

On November 6, 2013, the Tax Claim Bureau sent a letter to Taxpayers reminding them of the upcoming installment payment on the 2011 taxes scheduled for December 6, 2013.  Its letter advised:

> As was explained at the time the installment agreement was executed, the property will be exposed at the December 9, 2013 Continued Upset Sale if the terms of the agreement are not fully met.

R.R. 161a.  On December 9, 2013, Taxpayers' property was sold at the upset tax sale.

2

Taxpayers filed a petition to set aside the tax sale, and the trial court conducted a hearing. Pam DiJoseph, Upset Sale Coordinator, testified on behalf of the Tax Claim Bureau. Both Taxpayers also testified.

DiJoseph testified that in March 2012, the Tax Claim Bureau sent a Notice of Return and Claim to the Taxpayers advising them that a lien had been entered against their property for unpaid taxes for the year 2011.[2] In May 2013, the Tax Claim Bureau followed up with a Notice of Public Tax Sale to Taxpayers sent by certified mailing. The Notice stated that the approximate upset price for which the property would be sold was $11,471.69. R.R. 155a-56a. The Notice was returned as unclaimed. Thereafter, the Tax Claim Bureau sent a second notice,[3] by first class mail, to Taxpayers, and advertised the sale in three newspapers. Finally, in July 2013, the Sheriff posted a notice of the sale on the front door of the property. In September 2013, Linda Sampson made a payment of $4,500 and executed the 2013 agreement.

DiJoseph testified that it is the practice of the Tax Claim Bureau to offer taxpayers two different payment plans for dealing with their delinquent taxes.

---

[2] DiJoseph testified that the certified letter was received by Mrs. Sampson because the green card came back signed by Mrs. Sampson. Notes of Testimony, 1/4/2016, at 13; R.R. 41a.

[3] The second notice informed Taxpayers that the approximate upset price for which the property would be sold was $11,549.23. R.R. 157a-58a. Printed on the second sale notice was a statement on how to avoid sale, which instructed taxpayers:

> Payment should be made to the Tax Claim Bureau. If you are unable to pay the full amount due, the sale of the property may, at the option of the Bureau, be stayed if the owner thereof (or any lien creditor of the owner) on or before the actual sale enters into a written agreement with the Bureau to pay the taxes in installments in the manner provided by Section 603 of the Pennsylvania Real Estate Tax Sale Law, 72 P.S. §5860.603.

*Id*.

The so-called "stay agreement" stops "the sale completely and give[s] the taxpayer[s] until the following June to get everything paid." Notes of Testimony, 1/4/2016, at 18-19 (N.T., 1/4/2016, __); R.R. 46a-47a. To be eligible for the "stay agreement," the taxpayer must pay 25% of the amount owed. The Tax Claim Bureau also offers a "continued installment agreement," which also requires the taxpayer to pay "25% down" of what is pushing "the property to the sale for that year, and it would give them until December to just pay the balance." *Id.* The taxpayer chooses the agreement; however, DiJoseph advises people that, for the stay agreement, "you can only use it once every three years, so if there is any possibility that you're not going to be able to get everything paid by next June, then, you know, we're going to be in a problem." N.T., 1/4/2016, at 20; R.R. 48a. DiJoseph testified that before the taxpayer signs any agreement, she goes over each line of the agreement.

DiJoseph had no specific recollection of her meeting with Mrs. Sampson or the circumstances that led to the 2013 agreement. She believed, nevertheless, that she followed her standard practice.

On cross-examination, DiJoseph confirmed that Taxpayers' payment of $4,500 in September was more than 25% of the amount owed for the 2011 taxes. The balance on the 2011 taxes that had to be paid by December 6, 2013, was $1,236.87. N.T., 1/4/2016, at 35; R.R. 63a. The balance left on all other real estate taxes owed by June 30, 2014, was $7,500. *Id.* Regarding the amount driving the upset sale, DiJoseph explained:

> [Attorney:] Yes, but am I correct, then, the things that were driving it to sale would have been just the delinquent taxes through 2011?
>
> [DiJoseph:] Through 20 –

[Attorney:]    Right?

[DiJoseph:]    No – yeah, because they're a year behind when they come in to us.

[Attorney:]    That's what I'm saying.

[DiJoseph:]    Correct.

                              ***

[DiJoseph:]    … the 2011s … were pushing it to sale.  We also took it for the 2012.

[Attorney:]    Okay.

[DiJoseph:]    Because if we're taking it to sale, then we're going to take it for everything owing in our office.

[Attorney:]    Even though technically the 2012 were not absolute until sometime – yeah, the 2012s would not have been absolute –

[DiJoseph:]    Right.

[Attorney:]    -- until December 31st, 2013?

[DiJoseph:]    Correct.

N.T., 1/4/2016, at 53-54; R.R. 81a-82a.  In short, it was only the 2011 taxes that had to be paid in order to prevent the upset sale scheduled for September 6, 2013, from going forward.

Next, Linda Sampson testified.  She stated that she arrived at the Tax Claim Bureau on September 6, 2013, with a check for $4,500.  She acknowledged that she was given the 2013 Agreement and time to read it.  Sampson also testified that she informed the Tax Claim Bureau representatives that she needed "until the end of the year" to pay the remainder of the taxes and, specifically, could not make a payment on December 6, 2013.  N.T., 1/4/2016, at 71; R.R. 99a.  Sampson

5

testified that she was not offered two payment plans by anyone at the Tax Claim Bureau. After the upset sale, Sampson tried to make payment on the 2011 taxes, but it was refused by the Tax Claim Bureau. When she inquired into what could be done, the Tax Claim Bureau advised her to contact the purchaser, CJD Group, LLC (CJD). She testified that she and her husband cannot afford to purchase their home from CJD.

David Sampson also testified. He explained that he did not receive notice that there was going to be a tax sale of his home on December 9, 2013. He stated that they had been carefully setting aside funds to pay all of the taxes on the property, which he believed were owed at the end of December.

The trial court held that the 2013 Agreement signed by Taxpayers was not an installment agreement governed by Section 603 of the Tax Sale Law, 72 P.S. §5860.603.[4] Accordingly, the Tax Claim Bureau was not required to give Taxpayers one year to pay off their 2011 tax delinquency. The trial court further held that "the Bureau employee sufficiently went over the alternatives with Mrs. Sampson" and that the 2013 Agreement continued the tax sale for 90 days.[5] Trial

_____

[4] The text of Section 603 is set forth in this opinion, *infra*.

[5] The trial court's findings relevant to this holding follow:

    20.    Ms. DiJoseph could not recall the exact conversation that she had that day with Linda Sampson but, over objection, was permitted to testify as to her routine practices in the office. (*Cf.* Pa. R.E. 406).

    21.    As the Upset Sale Coordinator, Ms. DiJoseph invariably explains to the taxpayers what amounts need to be paid and when, and helps the taxpayers decide what alternatives are best.

    22.    For some taxpayers, an installment agreement is available which stays the sale for one year, and for others an alternative arrangement which initially continues the upset sale to another sale before year end is offered by the [Tax Claim] Bureau.

**(Footnote continued on the next page . . . )**

court op., 2/5/2016, at 11; R.R. 198a. Finally, the trial court held that the Tax Claim Bureau had the authority to enter into any type of payment plan, including the "continuation installment agreement" that it offered to Taxpayers when they presented more than 25% of the 2011 tax delinquency.

On appeal to this Court,[6] Taxpayers raise two issues. First, they contend that the trial court erred in holding that the Tax Claim Bureau complied with the requirements of the Tax Sale Law. Second, they contend that the 2013 Agreement violated due process and the Tax Sale Law, because it gave Taxpayers only one payment date, which was the day before the upset sale.

We begin with a general review of the Tax Sale Law, which assists in the collection of taxes but is not intended to deprive citizens of their property or to create investment opportunities for others. *Stanford–Gale v. Tax Claim Bureau of Susquehanna County*, 816 A.2d 1214, 1216 (Pa. Cmwlth. 2003). Due process is implicated in any taking of property for the collection of taxes. As explained by the United States Supreme Court:

---

**(continued . . . )**

> 23. The principal factors in selecting which installment agreement to employ are the amount of money the owners have, how long an extension they need, and the condition that if there would be a default in the installment agreement which stays and removes from the tax sale, the owners cannot enter into another installment agreement for three years.
>
> 24. Depending on the outcome of this discussion, Ms. DiJoseph then inserts the name, address and essential terms into the Continued Installment Agreement, brings it out to the taxpayers and goes over "each line" of it with them.

Trial court op., 2/5/2016, at 3-4; R.R. 191a-92a.

[6] Our review is to determine whether the trial court committed an error of law, abused its discretion, or rendered a decision without supporting evidence. *Darden v. Montgomery County Tax Claim Bureau*, 629 A.2d 321, 323 (Pa. Cmwlth. 1993).

> People must pay their taxes, and the government may hold citizens accountable for tax delinquency by taking their property. But before forcing a citizen to satisfy his debt by forfeiting his property, due process requires the government to provide adequate notice of the impending taking.

*Jones v. Flowers*, 547 U.S. 220, 234 (2006). Because of these due process concerns, this Court has explained that

> the focus is not on the alleged neglect of the owner, which is often present in some degree, but on whether the activities of the Bureau comply with the requirements of the statute.

*Smith v. Tax Claim Bureau of Pike County*, 834 A.2d 1247, 1251 (Pa. Cmwlth. 2003). A failure by a tax claim bureau to comply with each and every statutory requirement will nullify a sale. *Id*. at 1252.

The precise provision of the Tax Sale Law at issue here is Section 603. It states as follows:

> Any owner or lien creditor of the owner may, at the option of the bureau, prior to the actual sale, (1) cause the property to be removed from the sale by payment in full of taxes which have become absolute and of all charges and interest due on these taxes to the time of payment, or (2) enter into an agreement, in writing, with the bureau to stay the sale of the property upon the payment of twenty-five per centum (25%) of the amount due on all tax claims and tax judgments filed or entered against such property and the interest and costs on the taxes returned to date, as provided by this act, and agreeing therein to pay the balance of said claims and judgments and the interest and costs thereon in not more than three (3) instalments all within one (1) year of the date of said agreement, the agreement to specify the dates on or before which each instalment shall be paid, and the amount of each instalment. *So long as said agreement is being fully complied with by the taxpayer, the sale of the property covered by the agreement shall be stayed. But in case of default in such agreement by the owner or lien creditor, the bureau, after written notice of such default given by United States mail, postage prepaid, to the owner or lien creditor at*

8

> *the address stated in the agreement, shall apply all payments made against the oldest delinquent taxes and costs, then against the more recent.* If sufficient payment has been made to discharge all the taxes and claims which would have caused the property to be put up for sale, the property may not be sold. If sufficient payment has not been received to discharge these taxes and claims, the bureau shall proceed with the sale of such property in the manner herein provided either at the next scheduled upset sale or at a special upset sale, either of which is to be held at least ninety (90) days after such default. If a party to an instalment agreement defaults on the agreement, the bureau shall not enter into a new instalment agreement with that person within three (3) years of the default.

72 P.S. §5860.603 (emphasis added).

Section 603 contains several key provisions. First, the payment of 25% of the amount due "on all tax claims and tax judgments filed or entered against such property" entitles the taxpayer to enter into an agreement that will stay a scheduled sale. 72 P.S. §5860.603. Second, this agreement must give the taxpayer one year to complete payment on the "tax judgment," and it must specify the dates and amount of each installment. *Id.* Third, if the taxpayer defaults on one of the payments set forth in the agreement, the tax claim bureau must give written notice to the taxpayer of the default and not schedule the upset sale earlier than "ninety (90) days after such default." *Id.* This Court has held that where a taxpayer makes a payment of 25% or more, "the tax claim bureau must advise the taxpayer of the Section 603 option because its failure to do so 'would deprive the owner of his or her property without due process of law.'" *In Re Consolidated Return of the Tax Claim Bureau of the County of Beaver from the August 16, 2011 Upset Sale for Delinquent Taxes,* 105 A.3d 76, 82 (Pa. Cmwlth. 2014), *petition for*

9

*allowance of appeal denied*, 121 A.3d 497 (Pa. 2015) (quoting *Darden v. Montgomery County Tax Claim Bureau*, 629 A.2d 321, 323 (Pa. Cmwlth. 1993)).

In their first issue, Taxpayers assert that the Tax Claim Bureau did not inform Taxpayers of their right to enter into an installment agreement that was governed by Section 603 when they tendered $4,500. Further, when Taxpayers did not make payment on December 6, 2013, the Tax Claim Bureau did not give them a notice of the default or notice that the property would be listed for upset sale, as required by Section 603.

The Tax Claim Bureau responds that Taxpayers elected a "continuation installment agreement," which is authorized by Section 601 of the Tax Sale Law, 72 P.S. §5860.601,[7] and does not have to comport with the requirements of Section 603. Accordingly, the Tax Claim Bureau had no obligation to give Taxpayers notice of their payment default on December 6, 2013, or schedule the upset sale for 90 days after the default.

Taxpayers tendered a check for $4,500, when the amount due on all delinquent taxes for both 2011 and 2012 was $11,471.69. The $4,500 far exceeded 25% of what was owed on the delinquent 2011 taxes, which was the tax lien that

---

[7] Section 601 states, in relevant part:

> (a) The bureau shall schedule the date of the sale no earlier than the second Monday of September and before October 1, and the sale may be adjourned, readjourned or continued. No additional notice of sale is required when the sale is adjourned, readjourned or continued if the sale is held by the end of the calendar year. The bureau may, for convenience and because of the number of properties involved, schedule sales of property in various taxing districts or wards on different dates. Except as otherwise provided in this article, all sales shall be held by the bureau by the end of the calendar year.

72 P.S. §5860.601(a).

exposed the property to an upset sale. At that point, the Tax Claim Bureau was obligated to offer Taxpayers a Section 603 agreement and to stay the tax sale for the property listed for sale.

DiJoseph could not recall her conversation with Mrs. Sampson and could only testify about her practice. DiJoseph testified, in response to questioning as follows:

> [Attorney:] Okay. Now, you had mentioned earlier, but I want to make sure it's clear for the [trial court], are there two types of agreements that the Chester County Tax Claim Bureau will enter into with respect to taxpayers?
>
> [DiJoseph:] Yes.
>
> [Attorney:] Okay. And can you explain what the two names of those agreements are?
>
> [DiJoseph:] The first one would be what we call a stay agreement, and that would stop the sale completely and give the taxpayer until the following June to get everything paid, and they would have to put 20 – a minimum of 25 percent down in order to enter into that.
>
> The second one would be the continued, where they would have to put 25 percent down of just what's driving the sale, pushing the property to the sale for that year, and it would give them until December to just pay the balance of that figure.

N.T., 1/4/2016, at 18-19; R.R. 46a-47a.

The trial court held that the Tax Claim Bureau "sufficiently went over the alternatives" with Mrs. Sampson. Trial court op., 2/3/2016, at 11; R.R. 198a. This conclusion is not supported by the record or even the trial court's findings of fact, which state, in relevant part, as follows:

11

13. On September 6, 2013, Linda Sampson walked into the offices of the [Tax Claim] Bureau with a check in the amount of $4,500 in order to delay the tax sale.

14. She spoke with an employee named Patricia Guy.

15. *Linda Sampson advised Ms. Guy that she and her husband needed an extension of time to pay the balance of taxes due for 2011 through December 31, 2013.*

16. Ms. Guy took the check and said she would get a receipt.

17. *Ms. Guy returned with another employee who brought a contract with her.*

18. *That individual was Pamela DiJoseph, the Upset Sale Coordinator for the [Tax Claim] Bureau.*

19. At trial, Ms. DiJoseph identified the contract (Ex. D-9) as the document she prepared, denominated a "Continued Installment Agreement."

Trial court op., 2/5/2016, at 3; R.R. 191a (emphasis added). The trial court credited Mrs. Sampson's testimony that she informed Ms. Guy that she needed an extension to December 31, 2013, to pay the taxes. Trial court op., 2/5/2016, Finding of Fact ¶15. Then the trial court found that DiJoseph "brought a contract with her," *i.e.*, the "Continued Installment Agreement," which gave Taxpayers only to December 6, 2013, to pay their 2011 taxes. *Id.*, ¶17. The trial court did not find, as fact, that DiJoseph "brought" two contracts to present to Linda Sampson, one of which was a Section 603 agreement. Nor did the trial court find that either Guy or DiJoseph expressly offered a Section 603 agreement to Linda Sampson.

It was the Tax Claim Bureau's burden to establish that it provided the Taxpayers with a Section 603 installment agreement when they tendered 25% of the tax claim. *In re Consolidated Return of Tax Claim Bureau*, 105 A.3d at 82 ("…[T]he tax claim bureau must advise the taxpayer of the Section 603 option …

12

it is not the taxpayer's burden to request an installment agreement.") The trial court did not find, as fact, that the Tax Claim Bureau so advised Taxpayers. Accordingly, the upset sale was invalid.

The Tax Claim Bureau contends that, in any case, it was not required to offer Taxpayers a Section 603 agreement. It contends that its conduct was authorized by Section 601 of the Tax Sale Law, which states, in relevant part, as follows:

> The bureau shall schedule the date of the sale no earlier than the second Monday of September and before October 1, and *the sale may be adjourned, readjourned or continued*. No additional notice of sale is required when the sale is adjourned, readjourned or continued if the sale is held by the end of the calendar year. The bureau may, for convenience and because of the number of properties involved, schedule sales of property in various taxing districts or wards on different dates. Except as otherwise provided in this article, *all sales shall be held by the bureau by the end of the calendar year*.

72 P.S. §5860.601(a) (emphasis added).

Section 601(a) permits a tax claim bureau to continue a scheduled sale more than once, but only to the end of the calendar year.[8] *Id.* It can take this unilateral action for any reason or no reason, with or without the agreement of the owner of the property scheduled for upset sale. Indeed, Section 601(a) does not use the word "agreement" or make any reference to the payment of 25% "of the amount due on all tax claims and tax judgments...." 72 P.S. §5860.603. Section

---

[8] The Tax Claim Bureau calls its second plan a Section 601 agreement. Notably, this so-called Section 601 agreement did not comport with Section 601 because it extended the sale of the property beyond December 31, 2013. Section 601 only authorizes a continuance of a tax sale to the end of the calendar year.

13

601(a) does not authorize a tax claim bureau to devise an "agreement" with terms more favorable to the tax claim bureau than the one devised by the legislature in Section 603 of the Tax Sale Law. Nor does Section 601(a) authorize a tax claim bureau to deprive taxpayers of the protections in Section 603.[9]

In *Barker v. Chester County Tax Claim Bureau*, 143 A.3d 1069 (Pa. Cmwlth. 2016), this Court rejected the argument of the Tax Claim Bureau that it was authorized by Section 601 to offer taxpayers a payment plan to "continue" an upset sale. As we noted in *Barker*, there are many reasons why a tax claim bureau may wish to continue a sale, such as the failure of an upset sale to produce a bid equal to the amount of the delinquent taxes. When a sale is continued, the tax claim bureau need not repeat all the notice requirements undertaken for the first scheduled upset sale. However, we rejected the notion that Section 601 authorized a "continued" sales agreement that relieves the tax claim bureau of its duty to offer a taxpayer a Section 603 agreement with all the protections therein, *i.e.*, a one-year payment period, installments by date and amount, and notice of default on any installment.

Finally, a sale continued under Section 601(a) cannot take place where a property "has been removed from sale under Section 603." 72 P.S. §5860.601(a)(1).[10] When Taxpayers tendered $4,500, they became entitled to have

_____

[9] If a taxpayer refuses a Section 603 agreement, the tax claim bureau should obtain a written waiver.

[10] Section 601(a)(1)(ii) provides as follows:

    (1)   The bureau shall sell the property if all of the following are met:

* * *

       (ii)   *The property has not been discharged from the tax claim nor removed from sale under section 603*; or a tax judgment has been

**(Footnote continued on the next page . . . )**

14

their property "removed from sale under Section 603." Accordingly, the Tax Claim Bureau lacked authority to sell the property under the terms of Section 601(a)(1)(ii) of the Tax Sale Law. *Barker*, 143 A.3d at 1076.

The Tax Claim Bureau was obligated to offer Taxpayers a Section 603 agreement when they tendered more than 25% of "the amount due on the tax claims or tax judgments filed against their property and the interest and costs on the taxes returned to date...." 72 P.S. §5860.603. The Tax Claim Bureau did not do so. Nor was its so-called Section 601 agreement a valid way to discharge its duty under Section 603 of the Tax Sale Law. There is no authority for the Tax Claim Bureau to offer a taxpayer a Section 601 "agreement" when the taxpayer makes a payment of at least 25%.

For the above-stated reasons, we reverse the order of the trial court.[11]

_____
MARY HANNAH LEAVITT, President Judge

_____

**(continued . . . )**

    entered against the property prior to January 1, 1948, and is unsatisfied, and a sale of the property has not been stayed by agreement under this article.

72 P.S. §5860.601(a)(1)(ii) (emphasis added).

[11] Because we reverse, we need not address Taxpayers' additional claims that the Tax Claim Bureau did not follow other requirements in the Tax Sale Law or procedural due process.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

David Sampson and Linda Sampson   :
a/k/a Lida Sampson, jointly         :
and individually,                  :
            Appellants      :
                         :
          v.             : No. 355 C.D. 2016
                         :
The Tax Claim Bureau of       :
Chester County and CJD Group, LLC  :

# **O R D E R**

AND NOW, this 12th day of December, 2016, the order of the Court of Common Pleas of Chester County, dated February 5, 2016, in the above-captioned matter is hereby REVERSED.

_____
MARY HANNAH LEAVITT, President Judge